## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HUMANA INC.,                              )
                                          )
                    Plaintiff,            )
                                          )          C.A. No. _____
        v.                                )
                                          )
ST. JUDE MEDICAL, LLC,                    )
                                          )
                    Defendant.            )

## COMPLAINT

Plaintiff Humana Inc. complains against defendant St. Jude Medical, LLC ("St. Jude") as follows:

1.      For over four years, St. Jude Medical, Inc. (defendant's predecessor-in-interest) marketed pacemakers and other cardiac devices that it knew to be defective. Finally, in 2015, St. Jude issued a recall and acknowledged its primary responsibility for those defective devices. Thereafter, St. Jude and its corporate parent, Abbott Laboratories ("Abbott"), devised a scheme to stick Humana and other secondary payers with the costs of surgically removing and replacing the defective devices that had been implanted in the chests of their insureds. Humana brings this suit to recover the costs it incurred as a result of defendant's wrongdoing.

### Introduction

2.      From 2011 through 2015, St. Jude Medical, Inc. suppressed evidence that its cardiac-defibrillator devices had defective batteries which had the potential to deplete prematurely. Defective defibrillator batteries pose substantial risks to patients with heart-pacing conditions. Despite that risk, St. Jude Medical, Inc. ignored the problem.

3.      St. Jude Medical, Inc. was forced to reassess the matter only during negotiations for a business combination with Abbott that would ultimately convert the company to defendant

St. Jude Medical, LLC, an Abbott subsidiary. Defendant belatedly revealed the matter to the FDA, which after a ten-day inspection directed a nationwide recall of the devices. St. Jude's four-year delay in reporting and recalling the defective devices led to thousands of defective devices being implanted in patients, including Humana insureds, at great expense.

4.      Defendant's faulty devices and delayed reporting of those faults not only put these patients at grave risk from the faulty devices themselves, but it also caused a substantial number of those patients to require defective or at-risk devices to be surgically removed from their chests. That surgery alone costs tens of thousands of dollars, but it also came with the risk of further health complications and attendant costs.

5.      After the recall of its defective devices, St. Jude offered to compensate patients for the cost of a replacement device and their out-of-pocket medical expenses (up to $2,500). But it then secretly stuck Humana and other secondary payers with the remainder of the bill, which in most cases totaled tens of thousands of dollars. Generally, where patients are injured through the bad acts of another, they sue to recover damages. But because Humana's insureds had their out-of-pocket costs covered by St. Jude, those patients were not incented to make a claim against St. Jude. These side payments effectively deprived Humana of its right to assert its own claims against St. Jude as the party that was primarily responsible for the medical costs associated with the recalled devices.

6.      By making these payments to Humana insureds, St. Jude has demonstrated its responsibility for the costs arising from the defective devices and thus that it qualifies as a "primary plan." That is the statutory term of art under the Medicare Secondary Payer Act, 42 U.S.C. 1395y *et seq.* ("MSP Act") for self-insured entities that reimburse Medicare enrollees for costs that a Medicare Advantage Organization ("MAO" or "MA organization") such as Humana has already

paid on a conditional basis. In the ordinary insurance context, the insurer generally has a right of subrogation, entitling the insurer to recover monies it expended on the insured's behalf when a third party is primarily responsible for those expenditures. The MSP Act codifies several avenues for similar rights of recovery by Medicare or MAOs to recover expenditures that they made on behalf of their insureds for which third parties are ultimately responsible.

7.     To protect the pockets of the taxpayer—who ultimately foots all Medicare bills— the MSP Act shifts the burden to reimburse Medicare or MAOs to the "primary plan" (i.e., the responsible third-party) or risk the imposition of double damages if legal action is required to recover those expenditures.

8.     Humana was never notified by St. Jude or Abbott of the recall-related payments to Humana's insureds. On the contrary, St. Jude engineered the payment to Humana members and directed medical providers in such a way as to completely subvert Humana's ability to even know about, let alone recover, its costs under the normal means of recovery for secondary payers.

9.     By this suit, Humana seeks damages for St. Jude's failure to abide by the MSP Act's requirements, for common law relief, and for declaratory relief and an injunction going forward to require that St. Jude bears the entirety of medical costs arising out of its defective medical devices.

## Parties

10.     Humana Inc. is a Delaware corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky. The following subsidiaries of Humana Inc. provide medical coverage in various states and regions throughout all 50 States and Puerto Rico: Arcadian Health Plan, Inc.; CarePlus Health Plans, Inc.; Cariten Health Plan, Inc.; Cariten Insurance Company; CHA HMO, Inc.; CompBenefits Insurance Company; Emphesys Insurance Company; Health Value Management, Inc. d/b/a ChoiceCare Network; Humana Behavioral Health, Inc.;

HumanaDental, Inc.; Humana Benefit Plan of Illinois, Inc.; Humana Employers Health Plan of Georgia, Inc.; Humana Health Benefit Plan of Louisiana, Inc.; Humana Health Company of New York, Inc.; Humana Health Insurance Company of Florida, Inc.; Humana Health Plan of California, Inc.; Humana Health Plan of Ohio, Inc.; Humana Health Plan of Texas, Inc.; Humana Health Plan, Inc.; Humana Health Plans of Puerto Rico, Inc.; Humana Insurance Company; Humana Insurance Company of Kentucky; Humana Insurance Company of New York; Humana Medical Plan of Michigan, Inc.; Humana Insurance of Puerto Rico, Inc.; Humana Medical Plan of Pennsylvania, Inc.; Humana Medical Plan of Utah, Inc.; Humana Medical Plan, Inc.; Humana Pharmacy Solutions, Inc.; Humana Regional Health Plan, Inc.; and Humana Wisconsin Health Organization Insurance Corporation (collectively, the "Operating Subsidiaries").

11.     All of the Operating Subsidiaries are "organized and licensed under State law" of their respective states of incorporation "as a risk-bearing entity eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan." 42 U.S.C. § 1395w–25(a)(1).

12.     The Operating Subsidiaries have assigned the claims asserted here to Plaintiff Humana Inc. through two Assignment of Claims Agreements dated July 29, 2019 (attached and incorporated here as **Exhibits A** and **B**). The assignment agreements state that the assignors "may have legal claims under various laws, including but not limited to, the Medicare Secondary Payer Act, 42 U.S.C. 1395y *et seq.*, state statutory, and/or common law, against Abbott Laboratories, St. Jude Medical, and others in connection with defects" in devices that are listed in a schedule to the assignments, which is identical to the list of devices set forth in paragraph 55 of this Complaint. Under the agreements, the Operating Subsidiaries "irrevocably assign all rights, titles, and interests in the Claims to Humana." For purposes of this Complaint, Humana Inc. and the Operating

Subsidiaries are referred to collectively as "Humana."

13.     St. Jude Medical, Inc. was a corporation organized and existing under the laws of the State of Minnesota. St. Jude Medical, Inc. did business throughout the world and throughout the United States, including in the State of Delaware.

14.     Abbott completed its acquisition of St. Jude Medical, Inc. through two mergers. First, Vault Merger Sub, Inc., a wholly owned subsidiary of Abbott, was merged with and into St. Jude Medical, Inc., with St. Jude Medical, Inc. surviving the merger. Second, St. Jude Medical, Inc. was merged with and into Vault Merger Sub, LLC, with Vault Merger Sub, LLC surviving the merger. Following completion of the second merger, Vault Merger Sub, LLC was renamed St. Jude Medical, LLC.

15.     Pursuant to the terms and effect of the Agreement and Plan of Merger, dated April 27, 2016, executed by and among Abbott Laboratories, St. Jude Medical, Inc., and two wholly owned subsidiaries of Abbott named Vault Merger Sub, Inc. and Vault Merger Sub, LLC, St. Jude Medical, LLC is liable as the successor in interest to St. Jude Medical, Inc., and is responsible for the conduct of St. Jude Medical, Inc. as its predecessor in interest.

16.     Defendant St. Jude Medical, LLC is a limited-liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Saint Paul, Minnesota, where it purports to operate its global headquarters. St. Jude does business throughout the world and throughout the United States, including in the State of Delaware.

**Jurisdiction and Venue**

17.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, in that this is a civil action arising under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b).

18.     This Court has personal jurisdiction over St. Jude because as an entity organized and existing under the laws of the State of Delaware, St. Jude is "at home" in Delaware.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(c) because St. Jude does business in, and thus resides in, this judicial district.

## Procedural History

20.     This case originated on July 26, 2019, when Humana filed a complaint against both St. Jude and Abbott in the United States District Court for the Southern District of Florida, in a case entitled *Humana Inc., v. St. Jude Medical, LLC and Abbott Laboratories*, Case No. 1:19-cv-23119-UU. The Complaint here realleges claims that were asserted in that case. The defendants in that case moved to dismiss for lack of personal jurisdiction and for failure to state claims under all of the counts alleged. On December 31, 2019, the court dismissed the complaint without prejudice and closed the case on a matter that the defendants had not raised—namely, lack of standing. The Court held that though Humana had alleged that it was the assignee of its operating subsidiaries' claims, there were insufficient facts to demonstrate the validity of the assignments or that the subsidiaries had suffered an injury in fact. *Id.*, ECF No. 40. Humana disagrees that standing was insufficiently alleged (implicitly so did the defendants, or else they would have raised it in their motion to dismiss). Humana nevertheless promptly moved for leave to amend the complaint to cure those concerns by including additional allegations as to the assignments. To avoid further motion practice on personal jurisdiction, Humana also removed Abbott from its proposed amended complaint. The defendants objected to leave to amend, including by incorporating their original jurisdictional and substantive arguments. On July 13, 2020, the Court denied Humana's motion for leave to amend. *Id.*, ECF No. 46. It did not address the standing question but held that even if the amended complaint cured the standing concern, it did not allege facts establishing general or specific jurisdiction over St. Jude in Florida. The Court did not rule on any other matter, including the defendants' Fed. R. Civ. P. 12(b)(6) arguments, and denied the motion for leave to amend "without prejudice for Humana to bring suit in a forum where personal jurisdiction could be

6

exercised over St. Jude." *Id.* at 9. Since St. Jude has already conceded that it is "at home" in Delaware, Case No. 1:19-cv-23119-UU (S.D. Fla.), ECF No. 30 at 38, this Complaint continues the litigation in a forum where jurisdiction cannot be in dispute.

## Legal Background

21.    Title XVIII of the Social Security Act ("Medicare Act") creates the Medicare Program. 42 U.S.C. § 1395, *et seq.* Medicare is a system of federally funded health insurance for people 65 and older, certain disabled persons, and persons with end-stage renal disease.

22.    Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), acting under authority delegated by the Secretary of the U.S. Department of Health and Human Services ("HHS").

23.    Part A of the Medicare Act, 42 U.S.C. § 1395c, *et seq.*, provides insurance for costs of inpatient hospital services and certain other services. Part A is available without payment of premiums to most persons who paid Medicare payroll taxes before becoming Medicare-eligible. Part A generally pays 100% of the cost of covered services after deductibles and coinsurance, up to Medicare coverage limits. Private contractors, mainly insurance companies, administer Part A benefits under contracts with CMS. Those contractors were formerly known as Fiscal Intermediaries and are now known as Medicare Administrative Contractors.

24.    Part B of the Medicare Act, 42 U.S.C. § 1395j, *et seq.*, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically necessary outpatient services, such as doctors' office visits and home health care. Generally, Part B covers 80% of the cost of such services after exhaustion of deductibles. Private contractors, mainly insurance companies, administer Part B benefits under contracts with CMS. Those contractors were formerly known as Carriers and are now also known as Medicare

Administrative Contractors.

25.    With the exception of certain persons with end-stage renal disease, each individual eligible for Medicare is entitled to elect to receive benefits under the Medicare program through the original Medicare program under Parts A and B, or through enrollment in a Medicare Advantage plan under Medicare Part C. In the Medicare Part C or Medicare Advantage program, private contractors, mainly health-maintenance organizations and insurance companies, administer Medicare benefits under contracts with CMS. Those contractors were formerly known as Medicare + Choice organizations and are now also known as Medicare Advantage Organizations, or MAOs. *See* 42 U.S.C. § 1395w-21(a)(1).

26.    No matter which option beneficiaries choose, Medicare Parts A and B or Medicare Part C, the benefits provided are Medicare benefits, governed by Title XVIII and the Medicare regulations promulgated thereunder by CMS. Medicare pharmacy benefits are available through Medicare Part D.

27.    To qualify to become a Medicare Advantage plan, a MAO must meet strict qualifying standards and contract with CMS to provide Medicare benefits to those Medicare beneficiaries who elect to enroll in their plans. Medicare Advantage plans must provide all Medicare benefits offered under Parts A and B. They generally also provide additional or "supplemental" benefits. *See* 42 U.S.C. §§ 1395w-21–1395w-29.

28.    CMS funds MAOs and delegates to them the obligation to administer, pay, and assume Medicare's economic risk for the Medicare benefits provided to Part C enrollees, all pursuant to the requirements of Title XVIII and CMS Medicare regulations.

29.    The funds for Medicare Advantage benefits come from the Medicare Trust Funds. *See* 42 U.S.C. § 1395w-23(f).

30.    Currently, there are over 20 million people (about 34% of all Medicare beneficiaries) enrolled in the thousands of Medicare Advantage plans offered nationally by more than 400 MAOs. Humana is a MAO and offers Medicare Advantage plans to over 3.5 million members nationwide.

31.    From its inception through 1980, Medicare generally paid for medical services regardless of whether the recipient was also covered by another health-insurance plan.

32.    In response to skyrocketing costs in 1980, Congress began enacting the statutes that now comprise the MSP Act, 42 U.S.C. § 1935y(b). By its terms, the MSP Act applies to payments under Title XVIII of the Social Security Act, i.e., to the whole Medicare program.

33.    The MSP Act provides that when Medicare pays for treatment of an enrollee, and there is also a "primary plan," Medicare's payment is a conditional plan. The primary plan, and any entity that receives payment from a primary plan, must reimburse Medicare for the payment it made. 42 U.S.C. § 1395y(b)(2).

34.    The MSP Act defines a "primary plan" to include a "self-insured plan." 42 U.S.C. § 1395y(b)(2)(A)(ii). The Act further states: "An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." *Id*.

35.    By regulation, a Medicare beneficiary who receives payment from a primary payer is required to reimburse Medicare within sixty days, or else "the primary payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 C.F.R. § 411.24(h).

36.    A primary plan's responsibility for such payment "may be demonstrated by . . . a payment conditioned upon the receipt's compromise, waiver, or release (whether or not there is a

determination of admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." 42 U.S.C. § 1395y(b)(2)(B)(ii); *see also* 42 C.F.R. § 411.22(b).

37.     In the event that a primary plan fails to reimburse Medicare for its conditional payments made in the secondary position, the MSP Act authorizes a private cause of action to recover double damages from the primary plan. 42 U.S.C. § 1395y(b)(3)(A). This includes a statutory right of subrogation. 42 U.S.C. § 1395y(b)(2)(B).

38.     When Medicare Advantage plans recover reimbursement from primary plans or other liable parties pursuant to the MSP Act, those recoveries help reduce Medicare expenditures by the Medicare Trust Funds. Thus, recoveries by MAOs fulfill the essential purpose of the MSP Act: shifting expense from the Medicare program to primary payers.

39.     Humana, as a Medicare secondary payer, has standing under 42 U.S.C. § 1395y(b)(3) to bring this private cause of action to recover damages from St. Jude, as the primary payer, because Humana made conditional payments on behalf of its Medicare Advantage enrollees for which St. Jude was primarily liable and for which it did not reimburse Humana.

**Factual Background**

*St. Jude's Cardiac Devices*

40.     St. Jude Medical, Inc. manufactured a variety of medical devices designed to treat cardiac conditions, including Implantable Cardiac Defibrillator ("ICD") and Cardiac Resynchronization Therapy Defibrillator ("CRT-D") devices. ICD and CRT-D devices provide pacing therapy to support slow heart rhythms and electrical-shock or pacing therapy to treat fast heart rhythms.

41.     An ICD is a small device that is surgically placed into a patient's body to treat irregular heart rhythms, known as arrhythmias. ICDs operate by using electrical pulses or shocks

to control life-threatening arrhythmias. The shock is sent to the heart muscle to interrupt the rhythm disorder and to allow the heart to resume its normal rhythm.

42.    A CRT-D is also used to treat and control arrhythmias. The CRT-D is implanted in a patient's body. Three wires (leads) connected to the device monitor the heart rate to detect heart-rate irregularities. The device then emits tiny pulses of electricity to correct any irregularities.

43.    St. Jude Medical, Inc. received approval from the Food and Drug Administration ("FDA") to manufacture, market, and sell several models of ICDs and CRT-Ds. These models of St. Jude Medical, Inc.'s ICDs and CRT-Ds are powered by lithium-based batteries.

44.    If the battery unexpectedly runs out on one of the recalled devices due to the defect, the device becomes unable to deliver life-saving pacing or shocks, which could lead to serious health consequences, including death.

*St. Jude Learns of a Battery Defect*

45.    As early as 2011, St. Jude Medical, Inc. received evidence from its battery supplier that a phenomenon known as "lithium cluster bridging" was causing its device batteries to deplete prematurely.

46.    Between 2011 and 2014, St. Jude Medical, Inc. reviewed forty-two product reports showing evidence of premature battery depletion due to lithium cluster bridging.

47.    By 2014, St. Jude Medical, Inc. had received notice that premature battery depletion of one of its ICDs caused at least one patient's death, and that this device had lithium cluster bridging.

48.    In December 2014, a study published in the journal *HeartRhythm* reported cases of battery failure in St. Jude Medical, Inc.'s Fortify ICDs. The study attributed the failure to the presence of lithium clusters that form in the battery and cause a short circuit and high current drain.

49.    On information and belief, St. Jude Medical, Inc. did not advise the FDA, medical

providers, the public, or individuals using their devices of the battery depletion problem from 2011 through 2015. To this point, and despite the evidence of its product reports, St. Jude Medical, Inc. had concluded that the root cause of the battery depletion issue "could not be determined" and that the explanation of lithium cluster bridging was repeatedly "unconfirmed."

50.     In late 2015 and continuing through early 2016, Abbott and St. Jude Medical, Inc. conducted discussions about a potential business combination. To that end, Abbott conducted a due diligence review of St. Jude Medical, Inc.

51.     In April 2016, after the review, St. Jude Medical, Inc. opened new investigations into the premature battery depletion issue.

52.     In August 2016, after this review, St. Jude Medical, Inc. decided to commence a field action to recall the defective devices.

*The FDA Issues a Recall, Investigates St. Jude,*
*and Determines That St. Jude Violated Federal Requirements*

53.     On October 10, 2016, the FDA issued a Class I recall of certain models of St. Jude Medical, Inc.'s ICDs and CRT-Ds due to a battery defect, which can cause the batteries in those devices to deplete suddenly and prematurely.

54.     A Class I recall "is a situation in which there is a reasonable probability that the use of, or exposure to, a violative product will cause serious adverse health consequences or death." 21 C.F.R. § 7.3(m).

55.     In particular, the FDA issued a Class I recall of the following devices sold in the United States that St. Jude Medical, Inc. manufactured:

- Fortify VR: Model No(s). CD1231-40, CD1231-40Q

- Fortify ST VR: Model No(s). CD1241-40, CD1241-40Q

- Fortify Assura VR: Model No(s). CD1257-40, CD1257-40Q, CD1357-40C, CD1357-40Q

- Fortify Assura ST VR: Model No(s). CD1263-40, CD1263-40Q, CD1363-40C, CD1363-40Q

- Fortify DR: Model No(s). CD2231-40, CD2231-40Q.

- Fortify ST DR: Model No(s). CD2241-40, CD-2241-40Q, CD2263-40, CD2263-40Q

- Fortify Assura DR: Model No(s). CD2257-40, CD2257-40Q, CD2357-40C, CD2357-40Q

- Fortify Assura ST DR: Model No(s). CD2363-40C, CD2363-40Q

- Unify: Model No(s). CD3231-40, CD3231-40Q

- Unify Quadra: Model No(s). CD3249-40, CD3249-40Q

- Unify Assura: Model No(s). CD3257-40, CD3257-40Q, CD3357-40C, CD3357-40Q

- Quadra Assura: Model No(s). CD3265-40, CD3265-40Q, CD3365-40C, CD3365-40Q

- Quadra Assura MP: Model No(s). CD3269-40, CD3269-40Q, CD3369-40C

56.    The recall implicated hundreds of thousands of devices in St. Jude Medical, Inc.'s ICD and CRT-D lines, including 251,346 devices sold in the United States alone and 398,740 devices sold worldwide.

57.    In February 2017, FDA investigators inspected Abbott's facility in Sylmar, California, which formerly belonged to St. Jude Medical, Cardiac Rhythm Management Division. The FDA inspection revealed that St. Jude Medical, Inc. knew of the battery depletion defect as far back as 2011, but failed to report health risks posed by the device, failed to follow reporting requirements, failed to adequately control products that did not conform to specifications, and failed to follow corrective and preventive action procedures ("CAPA"). The FDA detailed these deficiencies and violations in two documents: a Form FDA 483 report directed to St. Jude Medical, Inc., and a Warning Letter directed to Abbott.

58.    As a result of its investigation, the FDA concluded that St. Jude Medical, Inc.:

a.  Failed to establish and maintain procedures for implementing corrective and preventative actions, as required by 21 C.F.R. § 820.100(a);

b.  Violated federal requirements, including a CAPA requirement that requires the level of corrective action and preventive action be commensurate with the significance and risk of the nonconformance, and requirement that the risk evaluation of nonconformances be based on three factors: severity, probability, and detectability;

c.  Violated—and its successor continued to be in violation of—the required Quality Management Review SOP (standard operating procedure);

d.  Released ten recalled ICDs from its distribution centers after the October 2016 recall had been issued, resulting in the implantation of seven additional recalled ICDs into U.S. patients; and

e.  Violated 21 C.F.R. § 820.90(a) by "failing to establish and maintain procedures to control product that does not conform to specified requirements."

59.    Consequently, the FDA issued a Form FDA 483 Report to St. Jude Medical, Inc. According to the FDA, a Form 483 is issued to firm management after an inspection when investigators have observed conditions that in their judgment may constitute violations of the Federal Food, Drug, and Cosmetic Act and related acts, including indications that a device has been adulterated or is being prepared, packed, or held under conditions that may cause it to become adulterated or injurious to health. Among other things, the FDA observed that "[a] correction or removal, conducted to reduce a risk to health posed by a device, was not reported in writing to FDA."

60.    The FDA sent the Form FDA 483 to St. Jude Medical, Inc.'s attention, but a

response was sent by Abbott by letter dated March 13, 2017, on Abbott letterhead. This letter was signed by Vishnu Charan, VP of Operations for Abbott, and Nalin Perera, Sr. Director of Operations Quality for Abbott. Mr. Charan and Ms. Perera were formerly executives of St. Jude Medical, Inc. but then worked for Abbott, holding substantially the same titles. In that letter, Abbott answered on behalf of "St. Jude Medical" but stated its (Abbott's) efforts to continue investigating and correcting the deficiencies cited by the FDA.

61.     On April 12, 2017, the FDA sent a warning letter to Mike Rousseau, President of Abbott's Cardiovascular & Neuromodulation Division, further detailing the violations found during the FDA inspection and requesting remedial action from Abbott. The letter indicated that the recalled devices were adulterated and that St. Jude's general violations included:

a.     "Failure to establish and maintain procedures for implementing corrective and preventive actions, as required by 21 CFR 820.100(a)";

b.     "Failure to establish and maintain procedures to control product that does not conform to specified requirements, as required by 21 CFR 820.90(a)";

c.     "Failure to ensure that design verification shall confirm that the design output meets the design input requirements, as required by 21 CFR 820.30(f)"; and

d.     "Failure to ensure that design validation shall include risk analysis, where appropriate, as required by 21 CFR 820.30(g)."

62.     The Warning Letter details these violations in five pages of single-spaced text.

*St. Jude Demonstrates Responsibility for the Recalled Devices*

63.     As part of the recall, St. Jude and Abbott posted information to patients with affected ICDs or CRT-Ds on their website (attached in relevant part as **Exhibit C**). They advised that they would provide replacement devices at no cost to affected patients and would cover up to $2,500 in unreimbursed medical expenses related to the replacement procedure:

15

> **If I Receive A Replacement Device, Will Abbott Cover Unreimbursed Medical Expenses (UMEs) Related To That Procedure?**
>
> Yes, if a device is explanted and the conditions of our warranty are met, Abbott will provide payment to patients in the U.S. for UMEs related to the replacement procedure up to $2,500. Contact our Warranty Department at SYWarrantydept@sjm.com to receive support with this process.

*Id.* at 3. They also offered to provide payments to U.S. patients for one-time office visits needed to address concerns related to the defect and recall, covering only unreimbursed medical expenses incurred by the patient, such as out-of-pocket expenses and co-pays. *Id.*

64.     Affected patients who took advantage of the recall included Medicare-enrollee beneficiaries covered under Humana's Medicare Advantage plans, and the medical costs relating to the replacement procedures were submitted by hospitals and other medical providers to Humana for reimbursement. Humana was not made aware that the medical costs were incurred for medical procedures related to the recalled devices.

65.     Humana does not know how many of its members were affected by the recall. It could be dozens, hundreds, or thousands of members. This is because invoices from providers do not identify the device manufacturer, and there is no practical way for Humana to determine whether the medical procedure to replace a defibrillator device involves one of St. Jude's recalled devices. Humana attempted to obtain this information from St. Jude and Abbott directly. They refused to provide that information and there is no way to obtain it without filing this suit.

66.     Nevertheless, it is reasonable to infer that Humana incurred substantial costs as the result of St. Jude's recall program. By way of a rough estimate: St. Jude recalled over 250,000 devices; it has been estimated that nearly half of those (125,000) affected Medicare patients; MAOs account for 34% of Medicare patients (42,500) and Humana has approximately 17% of the MAO market (7,225). Some of those patients may only have had a check-up visit and not a replacement procedure, which itself costs Humana money but not as much as a replacement procedure. Humana therefore estimates, based on the sheer number of recalled devices and its

16

substantial share of the market, that its damages are in the tens or hundreds of millions of dollars. The precise amount of such damages cannot be known or even estimated at this point because the information needed to do so is in the sole possession of St. Jude.

67.     Humana is aware of several specific instances of this conduct from around the country. The following are suspected cases from a sample of different states.

68.     <u>Florida</u>. Humana has approximately 857,000 members in Florida. One example of the foregoing involved a patient who for privacy reasons is here called "S.B." S.B. is a MA member of Humana Insurance Company ("HIC"), one of the Operating Subsidiaries. S.B. received her original St. Jude device in 2007 or 2008, which was replaced in approximately 2013. After her doctor at Broward Arrhythmia Physicians ("BAP") in Lauderdale Lakes, Florida, mentioned a "malfunction" and recall, S.B. received a replacement device at Westside Regional Medical Center ("Westside") in Plantation, Florida, in 2016. Contrary to her prior experience, S.B. did not receive any invoices for the replacement service; to the extent she paid anything, she was reimbursed for it. BAP and Westside submitted claims to HIC for reimbursement for the extraction procedure and associated medical costs in the amount of approximately $23,366, which HIC paid shortly after submission. The submissions were not coded to indicate that the procedures arose from a recall. For example, the main diagnosis was given as "Other specified complication of cardiac prosthetic devices, implants and grafts, initial encounter," while the primary associated procedure was indicated as "Removal of pacing cardioverter-defibrillator pulse generator with replacement of pacing cardioverter-defibrillator pulse generator; dual lead system." These descriptions do not identify St. Jude as the manufacturer of the device nor do they specify that the device was the subject of St. Jude's recall.

69.     <u>Louisiana</u>. Louisiana has approximately 234,000 Humana members. An example

from that state was a patient who for privacy reasons is here called "E.C." E.C. is a member of Humana Benefit Plan of Louisiana, Inc. ("HBP Louisiana"), one of the Operating Subsidiaries. E.C. had his original St. Jude device replaced in or about January 2017 at the Ochsner Medical Center in New Orleans, Louisiana. The providers submitted claims to HBP Louisiana for reimbursement for the extraction procedure and associated medical costs for which HBP Louisiana paid $54,194.93 shortly after submission. The submissions were not coded to indicate that the procedures arose from a recall. For example, the main diagnosis was given as "Encounter for adjustment and management of automatic implantable cardiac defibrillator" while the primary associated procedure was indicated as "Removal of pacing cardioverter-defibrillator pulse generator with replacement of pacing cardioverter-defibrillator pulse generator; multiple lead system." These descriptions do not identify St. Jude as the manufacturer of the device nor do they specify that the device was the subject of St. Jude's recall.

70.     Illinois. Illinois has approximately 188,000 Humana members. An example from that state was a patient who for privacy reasons is here called "D.T." D.T. is a member of HIC. D.T. had his original St. Jude device replaced in April 2015 at the OSF St. Francis Medical Center in Peoria, Illinois. The providers submitted claims to HIC for reimbursement for the extraction procedure and associated medical costs for which HIC paid $34,888.44 shortly after submission. The submissions were not coded to indicate that the procedures arose from a recall. For example, the main diagnosis was given as "Other complications due to other cardiac device, implant, and graft" while the primary associated procedure was indicated as "Removal of pacing cardioverter-defibrillator pulse generator with replacement of pacing cardioverter-defibrillator pulse generator; dual lead system." These descriptions do not identify St. Jude as the manufacturer of the device nor do they specify that the device was the subject of St. Jude's recall.

71.    <u>Kentucky</u>. Kentucky has approximately 270,000 Humana members. An example from that state was a patient who for privacy reasons is here called "C.W." C.W. is a MA member of HIC. C.W. had his original St. Jude device replaced in May 2017 at St. Elizabeth Healthcare in Edgewood, Kentucky. The providers submitted claims to HIC for reimbursement for the extraction procedure and associated medical costs for which HIC paid $28,744.48 shortly after submission. The submissions were not coded to indicate that the procedures arose from a recall. For example, the main diagnosis given was "Breakdown (Mechanical) of cardiac pulse generator (battery), initial encounter" while the primary associated procedure was indicated as "Removal of pacing cardioverter-defibrillator pulse generator with replacement of pacing cardioverter-defibrillator pulse generator; multiple lead system." These descriptions do not identify St. Jude as the manufacturer of the device nor do they specify that the device was the subject of St. Jude's recall.

72.    On information and belief, St. Jude encouraged or actively misled the foregoing providers to invoice the procedure that way so as to avoid their own liability for payment and instead to shift these costs to MAOs such as Humana. This is evidenced by the fact that the providers' invoices were coded in a way that obscured that these procedures were to replace St. Jude's recalled devices. Furthermore, by providing the replacement device at no cost and covering the patients' out-of-pocket costs, St. Jude intended (a) to remove any incentive for the patient to notify MAOs such as Humana of the fact that the costs arose from the recall; and (b) to have the providers present incomplete or misleading information that would induce Humana to reimburse the providers, and thereby obtain the benefit of not reimbursing the providers themselves.

73.    St. Jude's intent to obscure its conduct is further evidenced by its failure to comply with mandatory reporting requirements when primary plans (including self-insured plans) make payment to Medicare beneficiaries. 42 U.S.C. § 1395y(b)(8). The reports required under this

section are generally known as "Section 111" reports because they were required pursuant to Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007. 42 U.S.C. § 1395y(b)(7). St. Jude here made payments of "medical expenses" to Medicare beneficiaries, and was therefore required to submit Section 111 reports. Humana intends to seek those reports as part of its proposed discovery in this case. St. Jude either filed those reports (demonstrating its responsibility) or else failed to file them (thus further concealing its improper attempt to shift costs, and subjecting itself to the possibility of $1,000-per-day fines for each pacemaker placement it failed to report, *see* 42 U.S.C. § 1395y(b)(8)(E)).

74.     The patients who received replacement devices under St. Jude's program were Humana members covered by the assignments from the Operating Subsidiaries. Humana relied on this false, misleading, excluded, or incomplete information when reimbursing the providers. Humana paid the invoices for the foregoing providers because it lacked knowledge of the material fact that the procedures were for the purpose of replacing defective devices. If Humana had known all of the material facts, it would have rejected the provider invoices, sought reimbursement from St. Jude, or taken some other measure to avoid paying the medical costs arising from the replacement of the recalled devices.

75.     St. Jude has demonstrated responsibility to make payment for the costs associated with the defect and recall pursuant to 42 U.S.C. § 1395y(b)(2)(B)(ii) by offering replacement devices free of charge and offering up to $2,500 for patients' medical expenses.

76.     St. Jude has removed the incentive for patients to sue it or otherwise assert a claim for expenses associated with the defect and recall. But for St. Jude's offer to pay their out-of-pocket costs, patients would be financially incentivized to sue to recover their costs arising from the defect and recall. St. Jude has thereby circumvented the normal process that would allow for

20

Humana's recovery as a secondary payer.

77.     In the alternative, even in the unlikely event that St. Jude lacked knowledge of other coverage, that circumstance would not change the status of Humana's payments as conditional payments or relieve St. Jude  of the obligation to make primary payment. 43 C.F.R. § 411.21 ("Conditional payment means a Medicare payment for services for which another payer is responsible, made either on the bases set forth in subparts C through H of this part, or because the intermediary or carrier did not know that the other coverage existed.").

78.     Humana has not received any reimbursement to date for the conditional payments it made on behalf of its Medicare Advantage members in connection with medical costs arising from the recall of St. Jude's defective products.

## Count I

### Medicare Secondary Payer – Private Cause of Action
### 42 U.S.C. § 1395y(b)(3)(A)

79.     Humana incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint as if fully set forth in this paragraph.

80.     Congress has explicitly created a private right of action under the MSP Act where primary payment has not been made. 42 U.S.C. § 1395y(b)(3)(A) states: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement)" in accordance with the MSP Act.

81.     Humana is a secondary payer under the MSP Act.

82.     St. Jude is a primary plan under the MSP Act.

83.     St. Jude was required to, but did not, make appropriate reimbursement to Humana in accordance with the MSP Act and MSP regulations for all costs in connection with, arising out

of, or in any way related to the recalled ICD and CRT-D devices manufactured by St. Jude Medical, Inc.

84.     Humana paid conditional payments for those costs in an amount exceeding $75,000 and is entitled to recover double damages.

## Count II

### Medicare Secondary Payer – Right to Charge
### 42 U.S.C. § 1395w-22(a)(4)

85.     Humana incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint as if fully set forth in this paragraph.

86.     In what is known as the "right-to-charge" provision, Congress explicitly authorized MA organizations (which were originally called "Medicare+Choice" organizations) to charge a primary payer for conditional secondary payments. 42 U.S.C. § 1395w-22(a)(4) states in part:

> Notwithstanding any other provision of law, a Medicare+Choice organization may (in the case of the provision of items and services to an individual under a Medicare+Choice plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge . . . in accordance with the charges allowed under a law, plan, or policy described in such section—
>
> (A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services. . . .

87.     St. Jude has primary responsibility for the payment of all costs in connection with, arising out of, or in any way related to the recalled ICD and CRT-D devices manufactured by St. Jude Medical, Inc.

88.     Humana paid conditional payments for those costs in an amount exceeding $75,000, has the right to charge St. Jude for those payments, and is entitled to recover double damages under 42 U.S.C. § 1395y(b)(3)(A).

89.     Humana has issued a notice charging St. Jude for its conditional secondary

payments. St. Jude is in sole possession of information necessary to quantify the exact amount of the charge, which it has refused to provide despite repeated requests. St. Jude has failed to pay the charges.

## Count III

### Subrogation

90.     Humana incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint as if fully set forth in this paragraph.

91.     Humana has paid costs, or is subject to the payment of future costs, in connection with, arising out of, or in any way related to ICD and CRT-D devices manufactured by St. Jude Medical, Inc. that were recalled or that may be recalled.

92.     Under the terms of its MA coverage, Humana is a subrogee to the enrollees of its MA plans who obtained ICD or CRT-D devices manufactured by St. Jude Medical, Inc. that were recalled or that may be recalled. For example, Humana members S.B. and C.W. have materially identical subrogation provisions in their evidence of coverage documents that state: "If we pay a claim for you, we have subrogation rights. This is a very common insurance provision that means we have the right to recover the amount we paid for your claim from any third party that is responsible for the medical expenses or benefits related to your injury, illness, or condition. You assign to us your right to take legal action against any responsible third party[.]" E.C.'s benefit plan document also states that Humana "shall be subrogated to all rights of recovery," and D.T.'s likewise includes rights of recovery and an explicit "right of subrogation" against third parties.

93.     Humana did not in any meaningful sense act as a volunteer in paying these costs, because it was never notified (and still has not been notified) of the identity of these enrollees or what portion of its costs were paid or may yet be paid in connection with, arising out of, or in any way related to ICD and CRT-D devices manufactured by St. Jude Medical, Inc. that were recalled

or that may be recalled.

94.     Humana is not primarily liable for these costs, since they arose as a result of a defect in St. Jude's medical devices for which St. Jude has acknowledged responsibility.

95.     On information and belief, to the extent of any debt owed by their enrollees for the provision of their medical costs, Humana has paid off the entire debt.

96.     Subrogation will not work any injustice to the rights of a third party.

## Count IV

### Unjust Enrichment

97.     Humana incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint as if fully set forth in this paragraph.

98.     Humana has paid medical costs in connection with, arising out of, or related to recalled ICD and CRT-D devices manufactured by St. Jude Medical, Inc., in an amount exceeding $75,000.

99.     By paying those costs, which are properly the responsibility of St. Jude, Humana has conferred a benefit upon St. Jude.

100.    St. Jude has appreciated the benefit by avoiding payment for the costs itself, and by incentivizing Humana members to avoid notifying Humana that the costs were incurred as a result of the recall. St. Jude has accepted and retained this benefit under circumstances that make it inequitable for St. Jude to retain the benefit without paying Humana the value of the benefit. As a consequence of its conduct, St. Jude has unjustly retained a benefit to the loss of Humana, against the fundamental principles of justice or equity and good conscience.

101.    Consequently, St. Jude has obtained an enrichment.

102.    Humana has suffered an impoverishment.

103.    Humana's impoverishment is directly related to St. Jude's enrichment.

24

104.    St. Jude's enrichment and Humana's corresponding impoverishment are without justification

105.    Humana lacks a remedy provided by law.

## Count V

### Common Law Fraud

106.    Humana incorporates by reference the allegations of paragraphs 1 through 78 of the Complaint as if fully set forth in this paragraph.

107.    St. Jude has engaged in a pattern of fraudulent conduct that has occurred over an extended period of time. Because of the nature of the fraud and the number of acts constituting the fraud, Humana lacks detailed knowledge of all the circumstances surrounding the fraud. Nevertheless, Humana has identified certain instances, including those listed in paragraphs 68 through 71 of this Complaint, as cases likely involving St. Jude's wrongful conduct.

108.    St. Jude schemed to mislead Humana through both false statements and fraudulent omissions. The false statements were in the form of provider invoices suggesting that the medical costs arising out of the recall were for ordinary-course procedures instead of recalls for which St. Jude was the primary plan responsible for payment. St. Jude caused providers to make those false statements to Humana by either actively encouraging providers to file claims against medical insurers such as Humana, or by omitting material facts regarding their role as a primary plan that was responsible for payment in connection with their recall-related communications with providers.

109.    St. Jude also failed to notify Humana of the medical costs arising from recall-related procedures. St. Jude owed Humana a duty to disclose those facts. That duty arose out of the MSP statutes noted above, including 42 U.S.C. § 1395w-22 and § 1395y, their accompanying regulations, and the insurance-fraud statutes of several states as alleged in paragraph 122 of this

Complaint. On information and belief, St. Jude encouraged providers to seek reimbursement from Humana without disclosing material facts or by presenting invoices and other submissions with misleading, omitted, or incomplete information in order to conceal the fact that the medical costs arose from St. Jude's recall of its devices.

110.     St. Jude knew that Humana members would need medical procedures to explant their recalled devices and implant replacement devices, thus incurring medical costs. St. Jude further knew that providers typically seek payment for those costs from patients and from their medical insurers. St. Jude knew that by providing the replacement devices at no cost to patients, and by covering the patients' out-of-pocket costs, providers would seek the remaining reimbursement from medical insurers such as Humana. On information and belief, St. Jude knew that providers would either intentionally cooperate in this scheme or unintentionally participate simply by seeking reimbursement in the ordinary course.

111.     By failing to cover any cost but the cost of the device and the patients' out-of-pocket costs, St. Jude intended to induce Humana's reliance on invoices that presented misleading, omitted, or incomplete information, and to cover the remaining costs notwithstanding that those costs arose from its conduct.

112.     Humana justifiably relied on this false, misleading, omitted, or incomplete information. Among other reasons, it has a duty as a MAO to make conditional payments for the provision of services for its members.

113.     St. Jude's false, misleading, omitted, or incomplete information caused injury and damage to Humana. St. Jude gained a benefit by avoiding costs that it otherwise would have borne.

## <u>Count VI</u>

### State Consumer Fraud and Deceptive Trade Practice Law Claims

114.     Humana incorporates by reference the allegations of paragraphs 1 through 78 and

106 through 113 of the Complaint as if fully set forth in this paragraph.

115. St. Jude has engaged in fraudulent and deceptive business practices that violate the state consumer fraud, consumer protection, and/or deceptive trade practices laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, and Wisconsin, and in particular the following laws:

    a.  Ariz. Rev. Stat. Ann. § 44-1521, *et seq.* (Arizona);

    b.  Ark. Code Ann. § 4-88-101, *et seq.* (Arkansas);

    c.  Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

    d.  Colo. Rev. Stat. § 6-1-101, *et seq.* (Colorado);

    e.  Conn. Gen. Stat. § 42-110a, *et seq.* (Connecticut);

    f.  Fla. Stat. § 501.201, *et seq.* (Florida);

    g.  Ga. Code Ann. § 10-1-390, *et seq.* (Georgia);

    h.  815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

    i.  Ind. Code § 24-5-0.5-1, *et seq.* (Indiana);

    j.  La. Rev. Stat. Ann. § 51:1401, *et seq.* (Louisiana);

    k.  Md. Code Ann., Com. Law § 13-101, *et seq.* (Maryland);

    l.  Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* (Massachusetts);

    m.  Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

    n.  Minn. Stat. § 325F.68, *et seq.* (Minnesota);

    o.  Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

    p.  Nev. Rev. Stat. § 41.600, *et seq.* (Nevada);

    q.  N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

     r.   N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina);

     s.   S.C. Code Ann. § 39-5-10, *et seq.* (South Carolina);

     t.   Tenn. Code Ann. § 47-18-101, *et seq.* (Tennessee);

     u.   Wis. Stat. § 100.18, *et seq.* (Wisconsin).

116.    Humana is a person or consumer entitled to protection under the foregoing state laws.

117.    The consequence of St. Jude's conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare and raising the cost of insurance.

118.    Humana relied on St. Jude's false, misleading, omitted, or incomplete information to its detriment, which were material to its decision to bear the cost of the services arising from St. Jude's recall.

119.    Humana was directly and proximately injured by St. Jude, suffered an injury in fact, and suffered actual, ascertainable damages. Humana would not bear the cost of the services had St. Jude refrained from engineering its false representations or otherwise disclosed its scheme.

120.    St. Jude's conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## Count VII

### State Insurance Fraud Claims

121.    Humana incorporates by reference the allegations of paragraphs 1 through 78 and 106 through 113 of the Complaint as if fully set forth in this paragraph.

122.    St. Jude has committed insurance fraud in violation of the laws of Illinois, Kentucky, Pennsylvania, New Jersey, and Tennessee, and in particular the following laws:

     a.   720 ILCS 5/17-10.5 (Illinois);

    b.   Ky. Rev. Stat. § 304.47-010, *et seq.* (Kentucky);

    c.   18 Pa. Cons. Stat. Ann. § 4117 (Pennsylvania);

    d.   N.J. Stat. § 17:33A, *et seq.* (New Jersey);

    e.   Tenn. Code Ann. §§ 56-53-101 (Tennessee).

### Prayer for Relief

123.    Based on the foregoing, Humana requests that the Court enter an order that:

    a.   Enters judgment in favor of Plaintiff Humana and against Defendant St. Jude;

    b.   Requires St. Jude to reimburse Humana for all conditional payments made by Humana in connection with, arising out of, or in any way related to the recalled ICD and CRT-D devices manufactured by St. Jude;

    c.   Awards Humana double damages under 42 U.S.C. § 1395y(b)(3)(A);

    d.   Declares and permanently enjoins St. Jude such that, to the extent that any and all future costs in connection with, arising out of, or in any way related to the recalled ICD and CRT-D devices manufactured by St. Jude would otherwise have been conditionally paid by Humana for its Medicare-enrollee beneficiaries, those costs shall instead be borne by St. Jude and shall not be paid by Humana;

    e.   Permanently enjoins and requires St. Jude to notify hospitals and any other provider that any and all future costs in connection with, arising out of, or in any way related to the recalled ICD and CRT-D devices manufactured by St. Jude, its predecessors, or successors, and that would otherwise have been conditionally paid by Humana for its Medicare-enrollee beneficiaries, shall instead be borne by St. Jude and shall not be paid by Humana or submitted to Humana for reimbursement;

    f.   Awards Humana pre-and post-judgment interest;

    g.   Awards Humana its attorneys' fees and costs; and

    h.   Provides any other relief that the Court deems proper.

### Jury Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Humana demands a trial by jury for all issues so triable.

Dated: July 31, 2020

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE  19801
(302) 984-3800
bbennett@coochtaylor.com
*Counsel for Plaintiff Humana, Inc.*

**OF COUNSEL**
**EIMER STAHL LLP**
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel: (312) 660-7600
Fax: (312) 692-1718
Scott C. Solberg*
Email: ssolberg@eimerstahl.com
James W. Joseph*
Email: jjoseph@eimerstahl.com
Benjamin E. Waldin*
Email: bwaldin@eimerstahl.com

*Pro hac vice application forthcoming*

*Counsel for Plaintiff Humana Inc.*